IN THE DISTRICT COURT FOR THE UNITED STATES OF THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN DILLARD, et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| ROBERT R. BINION, et al., | ) | |
| | ) | |
|     Plaintiffs-Intervenors, | ) | |
| | ) | |
| GILBERT GREEN, | ) | |
| CALVIN JONES, JR., | ) | |
| | ) | |
|     Plaintiff-Intervenors, | ) | CIVIL ACTION NO. |
| | ) | 2:87cv1179-MHT |
|     v. | ) | (WO) |
| | ) | |
| CHILTON COUNTY COMMISSION, | ) | |
| et al., | ) | |
| | ) | |
|     Defendants. | ) | |

OPINION

This is another _Dillard_ case in which persons who were not parties to the original proceedings now challenge a final judgment affording relief under § 2 of the Voting Rights Act of 1965, as amended (42 U.S.C. § 1973), and the Fourteenth Amendment to the United States Constitution (as enforced through 42 U.S.C.

§ 1983) to African-American citizens of the city or county at issue. Unless and until applicable precedent from the Eleventh Circuit Court of Appeals is overruled by that court en banc or by the United States Supreme Court, this court has no choice but to uphold that challenge.

## I. BACKGROUND

The history of this case began 20 years ago as an outgrowth of proceedings in another case initiated in 1985 by plaintiff John Dillard and other plaintiff African-American citizens of Alabama in order to challenge the at-large, numbered-post election schemes employed by nine Alabama counties under § 2 and the Fourteenth Amendment. Dillard v. Crenshaw County, 640 F.Supp. 1347 (M.D. Ala. 1986). This court made a state-wide finding that these election schemes were the product of, or tainted by, racially inspired enactments of the Alabama legislature, id. at 1357-60, and subsequently

2

allowed the plaintiffs to expand their complaint to include 183 cities, counties, and county school boards that were using similar voting systems.  Dillard v. Baldwin County Bd. of Educ., 686 F.Supp. 1459 (M.D. Ala. 1988).

The Chilton County Commission was among the entities added to the Dillard v. Crenshaw County litigation after this court made its initial findings.  According to the 1980 census, Chilton County at that time had a total population of 30,610, and, of that number, 11.86 % were black; the black population was dispersed throughout the county.  Chilton County was governed by a five-member commission, one of whom was the probate judge and with the others elected as follows:  First, a candidate ran at-large, or countywide, with all voters in the county allowed to vote for the candidate. Second, the candidate ran for a "numbered post" or separate place; each position carried a separate number, and each candidate qualified for a specific number and place, with each

voter allowed to vote for only one candidate in each place. And third, the candidate had to receive a majority of votes cast in the primary to win the nomination of a political party; if no candidate received a majority of votes, a run-off primary election was held. The majority-vote requirement did not apply to general elections.

The commission admitted the § 2 and Fourteenth Amendment violation, and the parties proposed a seven-member commission elected by "cumulative voting." Under this system, each voter has as many votes as there are positions to be filled and may either divide her votes between candidates or concentrate her votes on a single candidate. Holder v. Hall, 512 U.S. 874, 910 n. 15 (1994) (Thomas, J., concurring). "The system thus allows a numerical minority to concentrate its voting power behind a given candidate without requiring that the minority voters themselves be concentrated into a single

4

district."   Id.   There are thus no majority-vote or
numbered-post requirements.

Over objections from several members of the plaintiff
class, this court approved and implemented the
settlement, Dillard v. Chilton Cty., 699 F.Supp. 870
(M.D. Ala. 1988), and the Eleventh Circuit affirmed this
court's action.   Dillard v. Chilton Cty., 868 F.2d 1274
(11th Cir. 1989) (table).

In the meantime, in Holder v. Hall, 512 U.S. 874
(1994), a Supreme Court plurality held that a federal
court cannot modify the size of an elected governing body
in order to remedy a § 2 violation because "[t]here is no
principled reason why one size should be picked over
another as the benchmark for [determining whether vote
dilution has occurred]."   Id. at 881. Subsequently, in
Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc),
the Eleventh Circuit held that, "under Holder, federal
courts may not mandate as a § 2 remedy that a state or
political subdivision alter the size of its elected

bodies." Id. at 1532; see also White v. Alabama, 74 F.3d 1058, 1072 (11th Cir. 1996) (holding that, under Holder and Nipper, the federal courts lacked the authority under § 2 to require even as part of an alleged settlement that the State of Alabama increase the size of its appellate courts).

In the wake of Holder, Nipper, and White, a challenged was leveled by intervening parties in one of the Dillard cases, Dillard v. Baldwin County Comm'n, to a court-ordered remedy (imposed based on this court's earlier state-wide finding of intentional discrimination) that, among other things, increased the size of the at-large elected commission from four to seven commissioners elected from single-member districts, thereby creating a majority-black district.  694 F.Supp. 836, 839-40 (M.D. Ala.), amended by, 701 F.Supp. 808 (M.D. Ala.), aff'd, 862 F.2d 878 (11th Cir. 1988) (tables) (Baldwin County Comm'n I).   In a critical decision, reversing the decision of this court in Dillard v. Baldwin County

Comm'n, 53 F.Supp.2d 1266, 1272 (M.D. Ala. 1999) (<u>Baldwin County Comm'n II</u>), the Eleventh Circuit held, first, that persons not parties to original proceedings had standing to challenge the court-ordered relief and, second, that they stated a cognizable challenge under § 2 to the relief, <u>Dillard v. Baldwin County Comm'n</u>, 225 F.3d 1271 (11the Cir. 2000) (<u>Baldwin County Comm'n III</u>).

After a trial on remand, this court sustained the § 2 challenge and vacated the original relief, <u>Dillard v. Baldwin County Comm'n</u>, 222 F.Supp.2d 1283 (M.D. Ala. 2002), <u>extended</u>, 282 F.Supp.2d 1302 (M.D. Ala. 2003) (<u>Baldwin County Comm'n IV</u>), and the Eleventh Circuit upheld that decision, agreeing that the original court-ordered relief was inappropriate in light of the teaching in <u>Holder</u>, <u>Dillard v. Baldwin County Comm'n</u>, 376 F.3d 1260 (11th Cir. 2004) (<u>Baldwin County Comm'n V</u>); the appellate court also held that cumulative voting was not an appropriate current remedy in the place of the now-inappropriate original remedy.   <u>Id</u>.

7

In March 2003, taking their cue from the challenge to the court-ordered relief in the <u>Baldwin County Comm'n</u> proceedings, Gilbert Green and Calvin Jones, Jr, intervened in this case claiming that, among other things, the 1988 relief afforded by this court for the § 2 and Fourteenth Amendment challenge to the election scheme for the Chilton County Commission violated <u>Holder</u>, <u>Nipper</u>, and <u>White</u>.

In March 2006, after the trial of this case, the State of Alabama enacted legislation, Act No. 2006-252, which provides state law authority for all local government election systems that are now operating under federal-court orders and that are not subject to a pending court challenge. Because the Chilton County Commission's cumulative-voting scheme is under a court challenge, Act No. 2006-252 does not apply to it.

## II. DISCUSSION

The above background suggests, at least at first blush, that this case is squarely controlled by what happened in the <u>Baldwin County Comm'n</u> litigation.  The plaintiffs here seek to distinguish that case on a number of grounds.  Unfortunately for them, their efforts simply cannot succeed without a change in appellate law.

First, <u>Holder</u>, <u>Nipper</u>, <u>White</u>, and now <u>Baldwin County Comm'n</u> make clear that changing from an at-large election system to cumulative voting is not an appropriate § 2 remedy because, simply put, "there is no objective and workable standard for choosing [it as a] reasonable benchmark[ ] over the many forms of government." <u>Baldwin County Comm'n V</u>, 376 F.3d at 1264 (internal quotations omitted).  The plaintiffs respond that the holdings, and the language explaining these holdings, are essentially beside the point because the court's power here to impose cumulative voting "proceeds not from the Voting Rights Act but from the consent decree Chilton County agreed

9

to." Plaintiffs' brief (Doc. No. 151), at 18; <u>see also</u> <u>id</u>. at 27 ("The district court's power and duty to enforce the consent decree arise from the contractual obligations it establishes between the plaintiff class, the State and its political subdivision, not from the court's remedial authority under the Voting Rights Act.").

At issue here, the plaintiffs contend, is a simple contractual agreement between them and the Chilton County Commission; as long as that agreement does not violate the Voting Rights Act, that is the end of the inquiry. The sole question is whether the consent decree <u>violates</u> the Voting Rights Act, not whether it is <u>authorized</u> by the Act. Plaintiffs' brief (Doc. No. 151), at 31 ("an agreed upon remedy that exceeds the scope of the Court's authority in an adjudicated case must be distinguished from settlement provisions that are 'inconsistent' with the Act, that incorporate practices that themselves are prohibited by the Act").

And, as the plaintiffs explain, "Neither seven seats nor cumulative voting rules are inconsistent with the Voting Rights Act[;] [n]either provision is a 'voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.'" Plaintiffs' brief (Doc. No. 151), at 19 (quoting 42 U.S.C. § 1973(a)).  "To the contrary," the plaintiffs add, "the Chilton County consent decree election system has been proven to promote the core Voting Rights Act objective of providing all citizens, in particular the protected class of African Americans, an equal opportunity 'to participate in the political process and to elect representatives of their choice.'"  Id., at 19-20 (quoting 42 U.S.C. § 1973(b)).

The plaintiffs further maintain that because of this posture--of simply enforcing an agreement--this case is critically different from the Baldwin County Comm'n case,

where the relief was imposed by the court, not consented
to by the defendant county commission.

The intervenors here argue that the issue is not
simply whether the remedy does not <u>violate</u>, or is not
inconsistent with, the Voting Rights Act, but rather is
whether the remedy is actually <u>authorized</u> by the Voting
Rights Act.   <u>White</u> and <u>Baldwin County Comm'n V</u> seem
flatly to support the intervenors' position.   in <u>White</u>,
the appellate court stated that, "In cases where the
Supreme Court has found that a consent decree violates
the statute under which the relief is granted, the Court
has not hesitated to set aside the decree."  74 F.3d at
1074 n.52.   In <u>Baldwin County Comm'n V</u>, the Eleventh
Circuit explained <u>White</u> to say that "a district court has
no authority to impose a remedy through a <u>consent decree</u>
that is not <u>authorized</u> by the Voting Rights Act."   376
F.3d at 1267 (emphasis added).   The Eleventh Circuit
therefore could not be more direct and unequivocal:
settlement or not, consent decree or not, the court has

12

no authority to impose a remedy not <u>authorized</u> by the Voting Rights Act.

To be sure, this language in <u>Baldwin County Comm'n V</u> is dictum, for the remedy there was court imposed; but in <u>White</u> the court was confronted with an alleged consent decree or settlement, and the above quote from <u>Baldwin County Comm'n V</u>, whether dictum or not, is the Eleventh Circuit's latest thinking on the way <u>White</u> should be read.

Moreover, and perhaps more pointedly, even if the question is whether the remedy violates the Voting Rights Act, the outcome here would be the same.  In <u>Baldwin County Comm'n III</u>, the Eleventh Circuit stated that, "By alleging that they are being subjected to, and their voting power is being affected by, an illegal election scheme that was plainly created because of or on account of race, the Intervenors have adequately stated a claim for a section 2 violation of the Voting Rights Act," 225 F.3d at 1281; the appellate court then added that it "has

13

made clear in <u>Nipper</u> and <u>White</u> that a district court may not remedy a section 2 violation by changing the size of a county commission." <u>Id</u>. And with these statements, the appellate court remanded the case to this court for the plaintiffs to justify the original remedy even though the remedy was based on a finding of intentional discrimination. Notably, because the court remanded only on the one question of whether the court-ordered relief was valid under the Fourteenth Amendment, the court made clear that the challengers had already prevailed to extent the original relief was based on § 2.

Thus, if the intervenors here can show the same, that is, that the Chilton County settlement to the extent it is based on § 2 is not authorized by § 2, this court must hold that they can recover on their challenge to the settlement to the extent the settlement is based on § 2. To the extent the settlement is based on the Fourteenth Amendment, the plaintiffs must show, as instructed by the Eleventh Circuit in <u>Baldwin County Comm'n III</u>, that the

14

relief is appropriate.   Here, while the parties
admittedly entered into a consent decree, the history of
this litigation reflects that the decree was accepted and
entered into "on account of race" and was intended to
remedy an alleged § 2 violation.   The Chilton County
consent decree to the extent it was based on § 2 is
therefore illegal.

The court recognizes, as aptly pointed out by the
plaintiffs here, that the intervenors here have not
alleged the 'traditional' § 2 claim.   They do not allege
that they have personally suffered vote dilution because
there are seven instead of four commissioners, or that
cumulative voting has impaired their equal opportunity to
participate fully in the political process and elect the
candidate of their choice.   The plaintiffs pointedly ask:
"Have the ... intervenors demonstrated any violation of
their personal rights that warrants vacating the consent
decree?"   Plaintiffs' brief (Doc. No. 151), at 33.   The
intervenors allege, and have shown, only that, as a

15

result of the consent decree, Chilton County Commission now uses cumulative voting instead of at-large voting to elect its commissioners.

But these matters were presented to and resolved by Baldwin County Comm'n III court.   There, Circuit Judge Barkett similarly observed that the intervenors there do not "allege that they personally suffer vote dilution because there are seven instead of four commissioners, or that the expanded commission size in any other way impairs their equal opportunity to participate fully in the political process and elect the candidate of their choice."   225 F.3d at 1283 (Barkett, J., concurring). "The only allegation to which the majority opinion points," she continued, "is the Intervenors' assertion that 'the district court intentionally increased the size of the Baldwin County Commission and redrew the district lines specifically in order to create a majority black district.'"   Id. (citation omitted).   Judge Barkett then concluded that, "This allegation is not sufficient, in my

16

view, to establish a claim under the Voting Rights Act,"
and that, as a result, "the majority's additional finding
that the Intervenors state a claim under Section 2 of the
Voting Rights Act is erroneous."   <u>Id</u>.

Needless to say, Judge Barkett's view was not the
view of the majority in <u>Baldwin County Comm'n III</u>;
indeed, that was the very view this court took in <u>Baldwin
County Comm'n II</u>, a view that the <u>Baldwin County Comm'n
III</u> court expressly rejected in holding that the
intervenors there had stated a viable § 2 claim.

Until Eleventh Circuit law is changed by the
appellate court en banc or by the Supreme Court, to
assert a collateral § 2 challenge and put to the test a
§ 2 remedy based on intentional discrimination, it is
sufficient for challengers to allege that "they are being
subjected to, and their voting power is being affected
by, an illegal election scheme that was plainly created
because of or on account of race," <u>Baldwin County Comm'n
III</u>, 225 F.3d at 1281; and, to prevail on the remedy to

17

the extent it based on § 2, it is also sufficient merely to show that the remedy, whether court-ordered or by consent decree, is not one of those <u>authorized</u> by § 2. <u>Id</u>. ("a district court may not remedy a section 2 violation by changing the size of a county commission"). In <u>Baldwin County Comm'n V</u>, the Eleventh Circuit held that § 2 does not authorized cumulative voting as a remedy for a challenge to an at-large voting scheme, for, as stated, "there is no objective and workable standard for choosing [it as a] reasonable benchmark[ ] over the many forms of government."  376 F.3d at 1264 (internal quotations omitted).

There is still the question of whether the cumulative voting scheme is an appropriate remedy for the Chilton County Commission to the extent the remedy reflected a compromise based on an alleged intentional-discrimination violation of the Fourteenth Amendment.  As in <u>Baldwin County Comm'n IV</u>, there is no evidence to support the conclusion that the Chilton County Commission

18

intentionally adopted an at-large scheme over cumulative
voting for racially discriminatory reasons.  <u>See, e.g.</u>,
<u>Baldwin County Comm'n IV</u>, 222 F.Supp.2d at 1289 ("[T]hese
[state-wide] findings did not justify the court's
conclusion that the Alabama Legislature's enactment of
numbered place laws in the 1960's for racially
discriminatory reasons tainted the Baldwin County's
Commission voting scheme.  The 2002 evidence reflects
that, in 1931, a law was enacted providing for the four
commissioners to be elected at-large but with the county
divided into four districts and with one commissioner to
reside in each district.  As it ends up, the enactment of
numbered place laws in the 1960's simply had no effect on
how the Baldwin County Commission was elected".).

Finally, the plaintiffs reiterate their argument that
intervenors, such as Green and Jones, lack standing.
First, they contend "that the standing issue [in] <u>Baldwin</u>
<u>County [Comm'n III]</u> was wrongly decided."  Plaintiffs'
brief (Doc. No. 151), at 47.  Second, they argue that

**Baldwin County Comm'n III**'s standing holding is distinguishable.   They maintain that the critical "difference is the fact that this Court did not alter Chilton County's 'democratically established system,'" id., but rather that "Chilton County, with the State's blessing, altered the statutory system by agreeing to a consent decree."  Id.  They say that, "All this Court did was to approve and adopt the settlement, finding it to be consistent with the core objectives of the Voting Rights Act and not contrary to public policy."   Id.   The plaintiffs then conclude that, "The intervenors, therefore, are not challenging the federal imposition of the current seven-seat, cumulative voting election system, but the power of Chilton County and the State of Alabama to adopt it through a consent decree without the ... intervenors' personal approval[;] the ... intervenors are making an unprecedented (and absurd) claim to have a personal right to veto the State of Alabama's decision to compromise a voting rights lawsuit, if that compromise

20

entails modifying a legislatively enacted election system." Id.

Baldwin County Comm'n III makes unequivocally clear that intervenors have "standing to defend the election scheme to which they were subject when that entire election scheme had been challenged as illegal." 225 F.3d at 1279. None of the nuances with which the plaintiffs seek to layer this language finds any support in the opinion.

Indeed, the plaintiffs' argument here is reminiscent of the one they made in Baldwin County Comm'n III: that the action at issue was really State, not federal, that the power being exercised was really State, not federal. In rejecting this argument, the Eleventh Circuit said that, "Activity performed pursuant to a federal court order is not transformed into the exclusive exercise of state power simply because it is performed by state actors who are obeying a federal court injunction." Baldwin County Comm'n III, 225 F.3d at 1281. Similarly

here, activity performed pursuant to a federal court
order is not transformed into the exclusive exercise of
state power simply because it is performed by state
actors who are obeying a federal court injunction based
on a consent decree.

The Eleventh Circuit has spoken on the standing issue
as it applies here, and because that "decision binds the
district courts sitting within its jurisdiction,"
McGinley v. Houston, 361 F.3d 1328, 1331 (11th Cir.
2004), this district court, like it or not, is so bound--
"unless and until that holding is overruled [by the
circuit] en banc or by the Supreme Court."    Baldwin
County Comm'n III, 225 F.3d at 1280; see also Baldwin
County Comm'n II, 53 F.Supp.2d at 1270 n.7 (While
"[r]ecent Supreme Court cases .. cast doubt on the
[]intervenors' standing to bring this case not only under
the tenth amendment but also under the eleventh amendment
and the Voting Rights Act as well[, t]he court ...
considers itself bound by ... circuit cases until that

precedent has been expressly overruled by or is irreconcilable with a subsequent decision of the Supreme Court or the Eleventh Circuit sitting en banc.").

An appropriate judgment will be entered.

DONE, this the 14th day of August, 2006.


  /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE