IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


JOHN DILLARD, et al.,        )
                             )
     Plaintiffs,             )
                             )
ROBERT R. BINION, et al.,    )
                             )
     Plaintiffs-Intervenors, )
                             )
GILBERT GREEN and            )
CALVIN JONES, JR.,           )
                             )
Plaintiff-Intervenors,       )
                             )   CIVIL ACTION NO.
     v.                      )   2:87cv1179-MHT
                             )        (WO)
CHILTON COUNTY COMMISSION,   )
et al.,                      )
                             )
     Defendants.             )


OPINION

     This suit is before the court on the issue of how to

undo the 1988 injunction it vacated on August 14, 2006,

in Dillard v. Chilton County Comm'n, ___ F.Supp.2d ____,

2006 WL 2355470 (M.D. Ala. 2006).  The court must

determine how to restore Chilton County, Alabama to an

election scheme completely free of the 1988 injunction in

a way that is feasible, equitable, and constitutional.
For the reasons that follow, the court agrees to the
suggestion of the commission and the county probate judge
that the undoing of the 1988 injunction conform to the
regular election cycle of the county commission.


## I. BACKGROUND

This case arises from a related action initiated over
20 years ago by plaintiff John Dillard and other
plaintiff African-American citizens of Alabama.  That
action challenged election schemes employed by nine
Alabama counties under § 2 of the Voting Rights Act of
1965, 42 U.S.C. §  1973, and the Fourteenth Amendment.
Dillard v. Crenshaw County, 640 F.Supp. 1347 (M.D. Ala.
1986).  This court made a state-wide finding that these
election schemes were the product of, or tainted by,
racially inspired enactments of the Alabama legislature,
id. at 1357-60, and subsequently allowed the plaintiffs
to expand their complaint to include 183 cities,

2

counties, and county school boards that were using similar voting systems. Dillard v. Baldwin County Bd. of Educ., 686 F.Supp. 1459 (M.D. Ala. 1988).

The Chilton County Commission was among the entities added to the Dillard v. Crenshaw County litigation after this court made its initial findings. The commission admitted the Voting Rights Act and Fourteenth Amendment violations, Dillard v. Chilton County Bd. of Educ., 699 F.Supp. 870, 871 (M.D. Ala. 1988), and, in 1988, this court approved and implemented a consent decree providing for an injunction expanding the size of the commission and requiring that commissioners be elected by cumulative voting, id. at 876; and the Eleventh Circuit affirmed this court's action, Dillard v. Chilton County Comm'n, 868 F.2d 1274 (11th Cir. 1989) (table). Pursuant to the 1988 injunction, the Chilton County Commission has operated under this election scheme.

In the wake of subsequent holdings of the Supreme Court and the Eleventh Circuit, a challenge was leveled

3

by intervening parties in one of the <u>Dillard</u> cases,
<u>Dillard v. Baldwin County Commission</u>, to a court-ordered
remedy imposed based on this court's earlier state-wide
finding of intentional discrimination.  Several appeals
were taken, the end result being that the intervenors
were successful in their collateral challenge.  <u>See</u>
<u>Dillard v. Baldwin County Comm'n</u>, 53 F.Supp.2d 1266, 1272
(M.D. Ala. 1999), <u>rev'd</u>, 225 F.3d 1271 (11th Cir. 2000),
<u>on remand</u>, 222 F.Supp.2d 1283 (M.D. Ala. 2002), <u>extended</u>,
282 F.Supp.2d 1302 (M.D. Ala. 2003), <u>aff'd</u>, <u>Dillard v.</u>
<u>Baldwin County Comm'n</u>, 376 F.3d 1260 (11th Cir. 2004).

In March 2003, taking their cue from the challenge to
the court-ordered relief in the <u>Baldwin County</u>
proceedings, Gilbert Green and Calvin Jones, Jr.
intervened in this case to challenge the consent decree
approved by this court in 1988.  Reasoning from the
outcome of the <u>Baldwin County</u> litigation, this court, on
August 14, 2006, sustained the intervenors' challenge and
vacated the 1988 injunction.  <u>Dillard v. Chilton County</u>

4

Comm'n, ____ F.Supp.2d at ____, 2006 WL 2355470 at *1 ("Unless and until applicable precedent from the Eleventh Circuit Court of Appeals is overruled by that court en banc or by the United States Supreme Court, this court has no choice but to uphold that challenge.").

The court's final task in this case, as it was in Dillard v. Baldwin County Commission, 289 F.Supp.2d 1315 (M.D. Ala. 2003), is to oversee the transition to a proper county commission election scheme not governed by the 1988 consent decree. To that end, the court ordered the defendants to submit a plan providing, as soon as is feasible, for the election of county commissioners under an election scheme that is completely free of the 1988 injunction. Dillard v. Chilton County Comm'n, ____ F.Supp.2d at ____, 2006 WL 2355470 at *7.

The Chilton County Commission and its probate judge propose a plan that entails the election of a new commission at the next regularly scheduled election in November 2008. The intervenors, by contrast, urge the

5

court to revert to Ala. Act 1951-872 (the 1951 Act), the law governing the composition and election of the commission prior to 1988, and order a special election early next year. Alternatively, the intervenors suggest that the court deem the commissioners' seats vacant and allow the Governor of Alabama to fill those vacancies by appointment. It has also come to the court's attention that Ala. Act 2003-217 (the 2003 Act), not yet precleared under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, purports to govern the composition and election of the commission.

## II. FINDINGS OF FACT

The court held an evidentiary hearing on September 14, 2006, to consider the various plans and proposals offered by the parties. Cf. Clark v. Roemer, 500 U.S. 646, 659-60 (1991) (grounding the district court's authority to fashion relief on its ability to hear evidence). During the hearing, two issues consistently

6

arose: the feasibility of calling a special election as the intervenors have proposed, and the role of the county's probate judge in the various alternatives before the court.

### A. Evidence Regarding a Special Election

Although the commission currently in place was elected pursuant to an injunction that has now been vacated, ordering a special election as a means of undoing that injunction is a remedy that should only be undertaken after careful consideration of the equities involved.  See Taylor v. Monroe County Bd. of Supervisors, 421 F.2d 1038 (5th Cir. 1970).[1]  The court therefore heard testimony regarding the implications of various alternatives put forward by the parties, particularly the intervenors' proposal for a special

---

1.  In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

election.[2]  Based on that testimony, the court finds the facts to be as follows.

First, a special election would cost the county approximately $ 120,000.  The county is already operating in an emergency spending mode on a line of credit extended by a local bank, and the financing for a special election would also have to be borrowed.

Second, if the court were to order an election plan according to the intervenors' schedule--with a primary election on Election Day in November 2006 and a special commission election in January 2007 or soon thereafter-- compliance with state and federal election rules, such as those regulating absentee and military voting, would be nearly impossible.

Third, the typical candidate for Chilton County Commission spends between $ 5,000 and $ 30,000 per

---

2. A county commissioner and the probate judge testified at the hearing.  The defendants were prepared to offer the testimony of all the commissioners, but the plaintiffs and intervenors stipulated to the fact that each commissioner's testimony would be substantially the same.

8

election for a job that pays only $ 18,000 per year. Consequently, candidates would be discouraged from running for the special election.

Fourth, voter turnout in Chilton County can be as high as 68 % in a presidential election year, but as low as 5 % for a special election. A special election would yield a far lower voter turnout than the 2008 election, which is a presidential election year.


## B. Evidence Regarding
## the Office of the Probate Judge

The court also heard testimony regarding the office of the probate judge, who would also serve _ex officio_ as chair of the commission under the intervenors' proposals. That testimony leads the court to find the facts as follows.

First, the amount of business in probate court has expanded steadily since 1988. Because the county population has increased from less than 30,000 in 1988 to more than 40,000 in 2006, and because of changes in

9

federal and state law, probate business has increased substantially. These changes have doubled the caseload of the probate judge in Chilton County over the past 18 years.

Second, the county's population growth since 1988 has been accompanied by significant economic development, which has significantly increased the demands upon the commission in terms of road maintenance, utilities, police, and other vital public services.

Third, due to the substantially increased demands upon both the county commission and the office of the probate judge since 1988, it is no longer reasonable to expect that the same individual could serve the county effectively both as probate judge and chair of the commission.


III.  DISCUSSION

In determining how to restore the Chilton County Commission to elections completely free of the 1988

10

injunction, this court has at least four alternatives before it.  First, as the intervenors have proposed as their preferred remedy, the court could order the defendants to hold a special election within the next six months and return to the election scheme as laid out by the 1951 Act, the state law governing the commission's elections immediately prior to the 1988 injunction.  That act provides for a commission composed of four commissioners, elected at large from residency districts to serve staggered terms of office, and chaired by the probate judge.

Second, as the intervenors have proposed in the alternative, the court could deem the 1951 Act controlling, but order the commission dissolved immediately.  Under the 1951 Act, the Governor is empowered to fill vacancies by appointment.  Again, as the 1951 Act would be controlling, the Governor would appoint four commissioners to replace the seven currently

sitting, and the probate judge would assume the position of chair.

Third, the court takes notice of an election plan as set forth in the 2003 Act, which has been enacted by the state legislature but not precleared under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. Under that plan, there are four commissioners elected from single-member districts, and the probate judge serves as chair of the commission.

Lastly, the defendants propose a plan that entails the election of a new commission at the next regularly scheduled election in November 2008. Under the defendants' plan, the commission will hold public hearings to seek input on a new election scheme for the county. The commission will then draft a bill and submit it to the legislature for enactment under state law. Once the bill obtains § 5 preclearance under the Voting Rights Act, the new election scheme can be implemented for the 2008 election cycle.

12

## A. Special Election
## under the 1951 Act

The court believes that there are two major problems with the intervenors' proposal for a special election under an election scheme governed by the 1951 Act: first, the prospect of holding a special election; and second, the role of the probate judge under the 1951 Act.

As the facts of this case demonstrate, holding a special election can be extremely costly to a local government, and these expenses can be unduly burdensome when not anticipated in the budget.  Furthermore, a special election is likely to generate fewer competitive candidates for office because the benefits of holding office for a period of time significantly shorter than a full term are slight--especially when those officeholders are faced with the prospect of campaigning and fundraising so soon for the next election.  Moreover, voter turnout in special elections is generally very low, on account of the populace being unaccustomed to an election mid-cycle and there being no other races to

13

generate interest in the election.  In sum, the public often benefits more from a general election held later than from a special election held sooner.  See United States v. City of Houston, 800 F.Supp. 504, 506 (S.D. Tex. 1992) (three-judge court).  The evidence before this court reflects that these problems, typical of court-ordered special elections, would be present in this case.

The court is also troubled by the provision of the 1951 Act that assigns the probate judge to chair the commission.  The evidence before this court reflects that the caseload of the probate judge has increased so significantly since 1988 that it is no longer appropriate for the commission chair and the probate judge to be one and the same.  The court is obligated, by virtue of its jurisdiction over the dismantling of the 1988 injunction, to oversee a transition to state law based on a reasonable and equitable framework for the commission's election and composition, and not simply plug an old statute into a new system.

14

In determining whether to order a special election as the intervenors have proposed, the court is obligated to balance all the equities involved. See Taylor, 421 F.2d at 1039. Accordingly, the court is mindful of the fact that the intervenors, having prevailed in their challenge to the 1988 injunction, have a strong interest in participating in an election scheme completely free of that injunction as soon as is feasible. However, the evidence before the court reveals that holding a special election would be at considerable expense to the county and would entail the aforementioned difficulties with a thin field of candidates and low voter turnout. Critical here is the short amount of time between the proposed special election and the next general election: even if new commissioners were to assume their seats in mid-2007, the next general election would be at most 18 months away. Additionally, the court is particularly troubled by the inequity of installing the probate judge as chair of the commission at this time. The Chilton County of

15

2006 is clearly not the Chilton County of 1988, and the people of Chilton County would be disserved by any remedy of this court that refused to recognize the difference.

Equitable considerations therefore weigh against the intervenors' plan for a special election.  See Toney v. White, 488 F.2d 310, 316 (5th Cir. 1973) (declining to hold special elections on account of expense and short terms of office); Moody v. Gallion, 286 F.Supp. 653, 657 (M.D. Ala. 1968) (Johnson, C.J.) (declining to order special elections on "general equitable principles"); see also Houston, 800 F.Supp. at 506; Armour v. Ohio, 775 F.Supp. 1044, 1062-63 (N.D. Ohio 1991) (three-judge court); Dotson v. City of Indianola, 514 F.Supp. 397, 402-03 (N.D. Miss. 1981) (three-judge court). Accordingly, the court declines to order a special election under the 1951 Act.

16

## B. Gubernatorial Appointment
## of Commissioners

The court is also not persuaded by the intervenors'
alternative argument that the Governor should appoint all
four commissioners merely because state law provides for
the Governor to fill vacancies.  It is true that if the
court were to order the commissioners removed from office
as a means of implementing its order vacating the 1988
injunction, then under a literal reading of the 1951 Act
the Governor would be empowered to fill those vacancies
by appointment.[3]  Ala. Act 1951-872, § 9.  But the court
does not believe that the statute was designed to fill
the gap in the event that _all_ the commissioners are
absent; and certainly the gubernatorial appointment
provision of the 1951 Act was not intended to be used to
convert a county from one voting system to another.
Rather, the Governor's power to fill vacancies by
appointment was designed to provide the county's

---

3.  In fact, according to testimony received at the
evidentiary hearing, the Governor has filled vacancies by
appointment under the 1988 injunction as well.

17

commission with its full complement of commissioners in the case of a mid-term resignation, untimely death, or removal from office.

The form of relief suggested by the intervenors, in fact, would disfranchise the people of Chilton County completely and provide them with no direct role in the transition to a form of government free of the 1988 injunction. In overseeing that transition, this court's obligations extend beyond dissolving the commission elected under the injunction; at issue here is the most equitable way to transition to a new form of government elected free from the injunction. Disfranchising the people of Chilton County is far from the most equitable way to accomplish that goal.

Moreover, the gubernatorial appointment plan also entails the probate judge serving as chair of the commission as required by the 1951 Act. Needless to say, the court is no less troubled by the prospect of overtaxing the probate judge were the Governor to fill

18

vacancies by appointment than under the intervenors'
preferred special election proposal. That the probate
judge would serve as commission chair lends support to
the court's conclusion that the gubernatorial appointment
plan is not an acceptable means of undoing the 1988
injunction.

The court next turns to the intervenors' argument
that the Governor must appoint new commissioners because
the commissioners now in office have no authority under
state law. See Green Intervenors' Response (Doc. No.
179), at 4. The court has not, by vacating the
injunction in operation at the time of the last county
election, stripped the entire commission of its authority
under state law. In vacating its 1988 injunction, the
court did not intend to create vacuum in the governance
of the county. Thus, the commissioners' seats are not in
any sense 'vacant.' Nor is the court aware of any case
in which a court has responded to a voting-rights
violation with the drastic remedy of vacating the seats

of the officeholders and permitting those seats to be
filled by executive appointment.   Cf. McDaniel v.
Sanchez, 452 U.S. 130, 150 n.30 (1981) ("Our prior
decisions in the apportionment area indicate that, in the
normal case, a court that has invalidated a State's
existing apportionment plan should enjoin implementation
of that plan and give the legislature an opportunity to
devise   an   acceptable   replacement   before   itself
undertaking the task of reapportionment."); Wise v.
Lipscomb, 437 U.S. 535, 540 (1978) ("When a federal court
declares   an   existing   apportionment   scheme
unconstitutional, it is ... appropriate, whenever
practicable, to afford a reasonable opportunity for the
legislature to meet constitutional requirements by
adopting a substitute measure ....").

   While the court appreciates the intervenors' interest
in a commission elected pursuant to an election scheme
completely free of the 1988 injunction, the commission as
presently constituted has all the authority granted to it

20

by the laws of Alabama unless and until a new election scheme is put into effect. Consequently, there is no need for the Governor to appoint new commissioners when the incumbents are fully capable of carrying out their duties until the next election takes place. The court accordingly declines to deem the commissioners' seats vacant under its August 14 order, to deem them vacant now, to order the commissioners removed from office, or to direct the Governor to appoint replacement commissioners under the 1951 Act.

## C. The 2003 Act

Although the court declines to order an immediate return to an election system under the 1951 Act, the intervenors are not mistaken in looking to state law. The 2003 Act, if and when it obtains preclearance under § 5 of the Voting Rights Act, could govern the composition and election of the Chilton County Commission. Under the 2003 Act, the commission's four

at-large residency districts are abolished in favor of four single-member districts.  The probate judge would serve as chair of the commission under the 2003 Act, just as he would under the 1951 Act.

Neither the intervenors nor the defendants specifically urged the court to adopt the 2003 Act as the plan for undoing the 1988 injunction.  Nonetheless, it is important to note that, in the event of preclearance, the 2003 Act could be controlling as state law.  Even this court's concerns over the equities of a plan that overburdens the office of the probate judge could very well take a back seat to the 2003 Act.

To date, the United States Attorney General has declined to review the Act while this court's injunction was in force.  Recently, the State of Alabama has represented to the court that it does not intend to seek preclearance until the appeals process in the instant litigation is complete.  But if the State of Alabama or the Chilton County Commission obtain § 5 preclearance of

22

the 2003 Act, then the court may have to revisit whether the defendants' plan should remain in place.

## D. The Defendants' Plan

Under the defendants' plan, the dissolution of the 1988 injunction will take place without a disruption in the regular election schedule and will provide the people of Chilton County an opportunity to fashion a commission best suited to their needs.  By incorporating the undoing of the 1988 injunction into the next general election in 2008, the plan will ensure maximum candidate readiness and voter participation.

Although the intervenors' interest in a commission not elected under the 1988 injunction is paramount, the evidence before the court suggests that the people of Chilton County would be poorly served by a plan that rushes to replace the current commission with a special election or gubernatorial appointment.  Furthermore, since the 2003 Act has not been precleared pursuant to

§ 5 of the Voting Rights Act, it is in the interests of the people of Chilton County to formulate a plan regarding the election and composition of the county commission that can be used in the 2008 general elections.

In sum, equitable considerations weigh in favor of the defendants' plan. Accordingly, and in light of this court's responsibility to oversee the transition from its 1988 injunction, recently vacated, to the election and composition of the county commission completely free of that injunction, the defendants' plan will be approved.

## IV. CONCLUSION

Although the intervenors did not put on any direct evidence to rebut that of the commissioners and although this court is generally required to show deference to a plan submitted by an elected commission, see, e.g., Wise, 437 U.S. at 540, this court has not overlooked the fact that the commissioners have a vested interest in

**24**

remaining in office as long as possible.  Thus, although the court by no means ignores its obligation to accord deference to the commission, nor does it discredit all the testimony it heard from the commissioner, it views much of that testimony with some skepticism and grants deference to the commission's plan with some qualification.

For example, the court declines to credit the commissioners' evidence that a special election would prevent commissioners from committing adequate time and attention to the duties of their office on account of the need to run for reelection.  With all due respect to the commissioners, most elected officials are almost constantly in the process of running for reelection, regardless of whether the election is imminent or a few years' distance.

Instead, critical to the court's findings was the testimony of the current probate judge himself, who, in contrast to the commissioner, is not at risk of having

his term of office shortened depending on how the court rules.  The probate judge would also seem to have little interest in seeing his power restricted, and yet his testimony before this court was highly critical of any remedy that would expand his authority to include that of commission chair.  The court therefore credits his testimony, and adopts his concern over the expanded role of his office under the 1951 Act.  Moreover, in large measure because the probate judge's testimony is consistent with the evidence presented by the commissioners, the court is more comfortable in crediting the recommendation of the commissioners that waiting until 2008 to hold an election is in the best interest of the citizens of Chilton County so that they can fashion a new election scheme to meet their substantially changed circumstances.[4]

---

4.  To the extent that there may be concerns about a cumulative voting scheme continuing in existence until 2008, it is important to note that cumulative and limited voting are not uncommon in this State.  While cumulative voting and limited voting may have been new to Alabama in

(continued...)

Therefore, the court will afford the following relief: the defendants' election plan will be approved; the defendants will be ordered to implement it according to the proposed schedule they have already submitted to the court; they will be required to file semiannual status reports with the court; and any party may seek further relief from the court if the defendants fail to implement their plan according to schedule. Should the 2003 Act achieve § 5 preclearance prior to the next election, any party may seek further and appropriate relief at such time.

As the 1988 injunction has been vacated, it is imperative that the defendants' plan effect a transition

---

4.   (...continued)
1988, that is no longer so. In other Dillard cases where the court approved consent decrees providing for cumulative voting and limited voting, the State of Alabama recently enacted a statute, Ala. Act 2006-252, making cumulative and limited voting a part of state law. Dillard v. Crenshaw County, No. 2:85cv1332-MHT (M.D. Ala.) (Doc. No. 681-2). Indeed, because state law is now the sole basis for those forms of government, the consent decrees are now being dissolved, and those cases dismissed.

to an election scheme completely free of that injunction in good faith and as quickly as is feasible.  During the period of that transition, and as long as the defendants are in compliance with the orders of the court, the commissioners shall retain their full authority under state law.  When that transition is complete, this case and this court's jurisdiction will come to an end.[5]

An appropriate judgment will be entered.

DONE this the 21st day of September, 2006.


                    /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE




_____

    5.  While not a reason behind the court's decision today, there is the advantage that, if the pending appeal of this case moves with dispatch (a goal that this court hopes both the parties and the Eleventh Circuit will pursue) so that there is an appellate decision a reasonable period of time before the 2008 regular election cycle and if the Eleventh Circuit should reverse this court's August 14 decision, there will not have been an unnecessary interruption of the Chilton County Commission's election process.